**ROBERT R. HENSSLER JR.**
California State Bar No. 216165
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
email: Robert_Henssler@fd.org

Attorneys for Mr. Perez-Gonzalez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE BARRY T. MOSKOWITZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.08CR1138-BTM |
| Plaintiff, | ) | DATE: May 27, 2008 |
| | ) | TIME: 1:30 p.m. |
| v. | ) | |
| ROGELIO PEREZ-GONZALEZ, | ) | STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTIONS |
| Defendant. | ) | |

**I.**

**STATEMENT OF FACTS**[1]

Agents of the United States Border Patrol arrested Mr. Perez-Gonzalez on March 14, 2008, near the Tecate, California Port of Entry. Mr. Perez-Gonzalez was initially questioned without being given <u>Miranda</u> warnings. Subsequently, Mr. Perez-Gonzalez was advised he had a right to contact the Mexican consulate and apparently was questioned again without <u>Miranda</u> warnings. Then, Mr. Perez-Gonzalez was advised

---

[1] This statement of facts is based on the complaint and indictment filed by the government and the discovery provided by the government. Mr. Perez-Gonzalez does not accept this statement as his own, and reserves the right to take a contrary position at motion hearings and trial. Additionally, Mr. Perez-Gonzalez reserves the right to challenge the truth and accuracy of these facts in any subsequent pleadings or during any further proceedings.

1    that his Administrative Rights would no longer apply because he was being charged criminally.  Mr. Perez-

2    Gonzalez was then advised of his <u>Miranda</u> rights and questioned for a third time.

3        On April 10, 2008, Mr. Perez-Gonzalez was arraigned on an indictment alleging a violation of 8

4    U.S.C. §1326, specifically deported alien found in the United States.

5        To date, counsel for Mr. Perez-Gonzalez has received some discovery and a DVD.  Counsel has not

6    yet had the opportunity to review Mr. Perez-Gonzalez's immigration file or received any recordings of his

7    removal proceedings.  These motions follow.

8    **II.**

9    <u>**MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**</u>

10        Mr. Perez-Gonzalez moves for the production of the following discovery.  This request is not limited

11    to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the

12    custody, control, care, or knowledge of any "closely connected investigative [or other] agencies."  <u>See</u>

13    <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir.), <u>cert. denied</u>, 493 U.S. 858 (1989).

14        (1) <u>The Defendant's Statements</u>.  The Government must disclose to the defendant <u>all</u> copies of any

15    written or recorded statements made by the defendant; the substance of any statements made by the

16    defendant which the Government intends to offer in evidence at trial; any response by the defendant to

17    interrogation; the substance of any oral statements which the Government intends to introduce at trial and

18    any written summaries of the defendant's oral statements contained in the handwritten notes of the

19    Government agent; any response to any <u>Miranda</u> warnings which may have been given to the defendant;

20    as well as any other statements by the defendant. FED. R. CRIM. P. 16(a)(1)(A).  The Advisory Committee

21    Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> the defendant's

22    statements, whether oral or written, regardless of whether the government intends to make any use of those

23    statements.

24        (2)   <u>Arrest Reports, Notes and Dispatch Tapes</u>.  The defendant also specifically requests the

25    Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate

26    to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to,

27    any rough notes, records, reports, transcripts or other documents in which statements of the defendant or

28    any other discoverable material is contained.  Such material is discoverable under FED. R. CRIM. P.

08CR1138

16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant.  <u>See</u> FED. R. CRIM. P. 16(a)(1)(B) and (C), FED. R. CRIM. P. 26.2 and 12(I).

(3) <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the Government's case.  Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

(4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The Government must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request includes any cooperation or attempted cooperation by the defendant as well as any information that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  The defendant also requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant to any other application of the Guidelines.

(5) <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of his prior record. FED. R. CRIM. P. 16(a)(1)(B).

(6) <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts under FED. R. CRIM. P. 16(a)(1)(C) and FED. R. EVID. 404(b) and 609.  In addition, under Rule 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . ." of any evidence the government proposes to introduce under FED. R. EVID. 404(B) at trial.  The defendant requests that such notice be given three (3) weeks before trial in order to give the defense time to adequately investigate and prepare for trial.

(7) <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any search, either warrantless or with a warrant.  FED. R. CRIM. P. 16(a)(1)(C).

(8) <u>Request for Preservation of Evidence</u>.  The defendant specifically requests the preservation of all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the

08CR1138

1    possession, custody, or care of the Government and which relate to the arrest or the events leading to the

2    arrest in this case.

3        (9)  Tangible Objects.  The defendant requests the opportunity to inspect and copy as well as test,

4    if necessary, all other documents and tangible objects, including photographs, books, papers, documents,

5    fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended

6    for use in the Government's case-in-chief or were obtained from or belong to the defendant.  FED. R. CRIM.

7    P. 16(a)(2)(c).  **Specifically, the defendant requests to view the A-File**.

8        (10)  Evidence of Bias or Motive to Lie.  The defendant requests any evidence that any prospective

9    Government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his

10   or her testimony.

11       (11)   Impeachment Evidence.   The defendant requests any evidence that any prospective

12   Government witness has engaged in any criminal act whether or not resulting in a conviction and whether

13   any witness has made a statement favorable to the defendant.  See FED R. EVID. 608, 609 and 613; Brady

14   v. Maryland, supra.

15       (12)  Evidence of Criminal Investigation of Any Government Witness.  The defendant requests any

16   evidence that any prospective witness is under investigation by federal, state or local authorities for any

17   criminal conduct.

18       (13)  Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.  The

19   defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

20   that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

21   any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

22   alcoholic.

23       (14)   Witness Addresses.  The defendant requests the name and last known address of each

24   prospective Government witness.  The defendant also requests the name and last known address of every

25   witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will

26   not be called as a Government witness.

27

28

(15)  <u>Name of Witnesses Favorable to the Defendant</u>.  The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.

(16)  <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.

(17)  <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500.  Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1).  <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963).  In <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) the Ninth

Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

(18)  <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any Government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any Government witnesses.

(19)  <u>Agreements Between the Government and Witnesses</u>.  The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability,  between any prospective Government witness and the Government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed.

(20)  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

charged against Mr. Perez-Gonzalez.  The Government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957).  The Government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(21)  <u>Bias by Informants or Cooperating Witnesses</u>.  The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

(22) <u>Government Examination of Law Enforcement Personnel Files</u>.  Mr. Perez-Gonzalez requests that the Government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers. Mr. Perez-Gonzalez requests that these files be reviewed by the Government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  The obligation to examine files arises by virtue of the defense making a demand for their review: the Ninth Circuit in <u>Henthorn</u> remanded for <u>in camera</u> review of the agents' files because the government failed to examine the files of agents who testified at trial.  This Court should therefore order the Government to review all such files for all testifying witnesses and turn over any material relevant to impeachment or that is exculpatory to Mr. Perez-Gonzalez prior to trial.  Mr. Perez-Gonzalez specifically requests that the prosecutor, not the law enforcement officers, review the files in this case.  The duty to review the files, under <u>Henthorn</u>, should be the prosecutor's.  Only the prosecutor has the legal knowledge and ethical obligations to fully comply with this request.

(23)  <u>Expert Summaries</u>.  Defendant requests written summaries of all expert testimony that the government intends to present under Federal Rules of Evidence 702, 703 or 705 during its case in chief, written summaries of the bases for each expert's opinion, and written summaries of the experts' qualifications.  FED. R. CRIM. P. 16(a)(1)(E).  This request includes, but is not limited to, fingerprint expert testimony.

08CR1138

(24) <u>Residual Request</u>.  Mr. Perez-Gonzalez intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  This request specifically includes all subsections of Rule 16.  Mr. Perez-Gonzalez requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

**III.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS' INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. PEREZ-GONZALEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  <u>See</u> Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns' instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2]  These instructions compounded Judge Burns' erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  <u>See</u> Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

//

//

//

---

[2]  <u>See, e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (en banc), <u>cert. denied</u>, 126 S. Ct. 736 (2005) (<u>Navarro-Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Perez-Gonzalez requests that the video presentation be produced.  <u>See</u> <u>United States v. Alter</u>, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

1.      **Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5, Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

Examination of the voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns' emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

08CR1138

1  <u>See</u> Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context which makes clear

2  that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when

3  it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

4  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

5  crime."

6       Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that,

7  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

8  Because of the redactions of the grand jurors' names, Mr. Perez-Gonzalez will refer to them by occupation.

9  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter

10  REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug

11  prosecutions were not an effective use of resources.  <u>See</u> <u>id.</u> at 16.  The CSW was also troubled by certain

12  unspecified immigration cases.  <u>See</u> <u>id.</u>

13       Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

14  CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in

15  this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

16  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

17  simply not capable of expression in the context of grand jury service.  <u>See</u> <u>id.</u> at 16-17.  Thus, without any

18  sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to

19  decline to indict in an individual case where the grand juror "[didn't] like what our government is doing,"

20  <u>see</u> <u>id.</u> at 17, but in which there was probable cause.  <u>See</u> <u>Id.</u>  Such a case "should go forward."  <u>See</u> <u>id.</u>  Any

21  grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns

22  would permit them to vote "no bill" in the face of a showing of probable cause.

23       Just in case there may have been a grand juror that did not understand his or her inability to exercise

24  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

25  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

26  "medical marijuana."  <u>See</u> <u>id.</u> at 24.  Judge Burns first sought to address REA's concerns about medical

27  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

28  considerations into account.  <u>Id.</u> at 24-25.  Having stated that REA was to "abide" by the instruction given

1  to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases.

2  See id. at 25.

3      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

4  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

5  juror is obligated to vote to indict if there is probable cause. See id. at 26-27. Thus, the grand juror's duty

6  is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an

7  "obligation" to indict.

8      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

9  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

10  to indict in every case in which there was probable cause. See id. at 27. Two aspects of this exchange are

11  crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization --

12  whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote

13  "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many

14  or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore

15  REA's views. The message is clear: it does not matter what type of case might prompt REA's reluctance

16  to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

17  forward." See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict

18  was too great a risk to run.

19      **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer**
        **Exculpatory Evidence.**

20

21      In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

22  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See

23  Ex. A at 20.[4]

24  _____

25  [4]  These instructions were provided in the midst of several comments that praised the United States
    attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that
26  the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in
    good faith in all matters presented to you." See Ex. A at 27; see also Ex. B at 38; id. at 43; id. at 40 ("You
27  were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that
    they're not about the business of trying to indict innocent people or people that they believe to be innocent
28  or the evidence doesn't substantiate the charges against.").

1   The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

2   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

3   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

4   adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

5   Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

6   that was "adverse" or "that cuts against the charge." See id.

7   **B.   Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers
        of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
8       **During Impanelment.**

9   The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

10  grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

11  Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

12  approach[5] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

13  the defendants in those cases. The district court's instructions cannot be reconciled with the role of the

14  grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the

15  January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the

16  direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and

17  utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers

18  envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

19  For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

20  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

21

22      In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses,
    Judge Burns' instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there
23  is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the
    dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction,
24  which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition
    that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume
25  grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume
    that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify
26  whether they understood the instruction as given and then followed it.").

27  [5]See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because
    "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty
28  or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1   deciding whether a particular prosecution shall be instituted or followed up, performs much the same

2   function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

3   510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

4   I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

5   prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

6   the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

7   but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

8   by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

9   Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

10  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

11  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

12  Procedure § 15.2(g) (2d ed. 1999)).

13          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

14  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

15          The grand jury thus determines not only whether probable cause exists, but also whether to
            "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
16          most significant of all, a capital offense or a non-capital offense -- all on the basis of the
            same facts.  And, significantly, the grand jury may refuse to return an indictment even
17          "'where a conviction can be obtained.'"

18  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

19  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

20  "controls not only the initial decision to indict, but also significant questions such as how many counts to

21  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

22  a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-

23  Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the

24  power to refuse to indict someone even when the prosecutor has established probable cause that this

25  individual has committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367

26  F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002)

27  (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong

28  support in the Ninth Circuit.  But not in Judge Burns' instructions.

**C.    Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established in Both _Vasquez_ and _Navarro-Vargas II_.**

The _Navarro-Vargas II_ majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in _Marcucci_. _Marcucci_ reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. _See Navarro-Vargas II_, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). _See also id._ ("The 'word' should is used to express a duty [or] obligation.") (quoting _The Oxford American Diction and Language Guide_ 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'. . . ." _See_ Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." _Vasquez_, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, _see_ Ex. B at 4, 8, in context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." _See id._ at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." _See Navarro-Vargas_, 408 F.3d at 1205. Clearly he was not.

1    By the same token, if Judge Burns said that "the case should move forward" if there is probable

2    cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

3    Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

4    two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

5    been his intent.  But even if it were, no grand jury could ever have had that understanding.[6]  Jurors are not

6    presumed to be capable of sorting through internally contradictory instructions.  See generally United States

7    v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

8    presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

9    Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

10    clear to the grand jurors that "should" was not merely suggestive, but obligatory:

11    **(1)**    The first occasion occurred in an exchange when Judge Burns conducted voir dire and

12    excused a potential juror (CSW).  See Ex. B at 17.

13    **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that there

14    is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.  See

15    id. at 26-27.  After telling this potential juror (REA) what his obligations and prerogatives were, the Court

16    inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced

17    there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It

18    would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and

19    contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no

20    prerogative to do anything other than indict if there is probable cause.

21    **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

22    home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

23    on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

24    here." See id. at 61.

25

26

27    [6] This argument does not turn on Mr. Perez-Gonzalez's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-

28    Vargas/Marcucci reading as a possibility.

(**4**)     And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that they were forbidden from considering the penalties to which indicted persons may be subject. See Ex. B at 24-25. A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information. See id.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

15

08CR1138

1  the initial decision to indict, but also significant decisions such as how many counts to charge and whether

2  to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

3  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to

4  indict." See id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore

5  represent structural constitutional error "that interferes with the grand jury's independence and the integrity

6  of the grand jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The

7  indictment must therefore be dismissed.  Id.

8       The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

9  instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

10  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

11  decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

12  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

13  independent." Id. at 1202 (emphases in the original).

14       Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

15  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

16  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The

17  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

18  making a probable cause determination . . . unconstitutionally undermines the very structural protections

19  that the majority believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption' of

20  the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).

21  If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role

22  described in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give

23  jurors erroneous instructions because nothing will happen if they disobey them." Id.

24       In setting forth Judge Hawkins' views, Mr. Perez-Gonzalez understands that this Court may not

25  adopt them solely because the reasoning that supports them is so much more persuasive than the majority's

26  sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

27       Here, again, the question is not an obscure interpretation of the word "should", especially in light

28  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by

1    the Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed to the defense, but an absolute ban

2    on the right to refuse to indict that directly conflicts with the recognition of that right in <u>Vasquez</u>, <u>Campbell</u>,

3    and both <u>Navarro-Vargas II</u> opinions.  <u>Navarro-Vargas II</u> is distinguishable on that basis, but not only that.

4          Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

5    they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

6    prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle . . . ."  <u>See</u>

7    Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

8    embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

9    conscience of the community.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

10   grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

11   of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

12   1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

13   their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

14   here, Judge Burns has both fashioned his own rules and enforced them.

15   **D.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present**
     **Exculpatory Evidence to the Grand Jury.**

16

17         In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

18   argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

19   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

20   common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

21   judicial authority exists."  <u>See</u> <u>id.</u> at 47.  Indeed, although the supervisory power may provide the authority

22   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

23   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

24   Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

25   does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  <u>Id.</u>

26   at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

27   initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

28   claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See</u> <u>id.</u> at 51-55.

1    Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

2  present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.  Moreover, the district

3  court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can

4  expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ...

5  they'll act in good faith in all matters presented to you."  <u>See</u> <u>id.</u> at 27.  The Ninth Circuit has already

6  concluded it is likely this final comment is "unnecessary."  <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

7    This particular instruction has a devastating effect on the grand jury's protective powers, particularly

8  if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

9  conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Ex. A at 20.  Thus, once again,

10  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

11  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

12  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

13  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

14  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

15  cause, but, if none is presented by the government, they can  presume that there is none.  <u>See</u> Ex. B at 14-15

16  ("my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts

17  against the charge, you'll be informed of that.  *They have a duty to do that.*") (emphasis added).

18    These instructions create a presumption that, in cases where the prosecutor does not present

19  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

20  exculpatory evidence was presented, would proceed along these lines:

21    (1)    I have to consider evidence that undercuts probable cause.

22    (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

23  evidence to me, if it existed.

24    (3)    Because no such evidence was presented to me, I may conclude that there is none.

25  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

26  evidence presented represents the universe of all available exculpatory evidence; if there was more, the

27  duty-bound prosecutor would have presented it.

28

1    The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

2    prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

3    probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

4    of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

5    the Fifth Amendment.

6                                                **IV.**

7                        **MOTION TO PRODUCE GRAND JURY TRANSCRIPTS**

8        Mr. Perez-Gonzalez hereby moves this Court to compel the government to produce all grand jury

9    transcripts in this case.  See U.S. CONST. AMENDS V & VI[7].  Federal Rule of Criminal Procedure

10   6(e)(3)(E)(ii) allows disclosure "at the request of a defendant who shows that a ground may exist to dismiss

11   the indictment because of a matter that occurred before the grand jury."  Given the above arguments, it is

12   clear that "a ground may exist to dismiss the indictment because of a matter that occurred before the grand

13   jury."  FED. R. CRIM. P 6(e)(3)(E)(ii).  (*I.e.,* whether the government presented and proved an actual

14   "removal[8]" to the grand jury; whether the "removal" occurred subsequent to June 26, 2006, etc.)

15       Mr. Perez-Gonzalez requests the Court "authorize disclosure" of the grand jury transcript to allow

16   Mr. Perez-Gonzalez to adequately prepare for trial and to perfect his appellate record.  See id.

---

17

18   [7] The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional heritage which
     was brought to this country with the common law.  The Framers, most of them trained in the English law

19   and traditions, accepted the grand jury as a basic guarantee of individual liberty . . . the grand jury continues
     to function as a barrier to reckless or unfounded charges.  'Its adoption in our Constitution as the sole

20   method for preferring charges in serious criminal cases shows the high place it held as an instrument of
     justice.'  Costello v. United States, 350 U.S. 359, 362 (1956).  Its historic office has been to provide a shield

21   against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only
     upon the considered judgment of a representative body of citizens acting under oath and under judicial

22   instruction and guidance. "  United States v. Manduano, 425 U.S. 564, 571 (1976).  In order to ensure that
     the criminally accused are safeguarded from reckless and unfounded charges, judges must take their duty

23   to provide guidance seriously and not simply pay lip service to the assurances of the government.  It is
     curious why the government, in this district in particular, fights so hard to keep grand jury proceedings

24   sealed.  Interestingly, in many cases, the "witness" who "testifies" before the grand jury is a border patrol
     agent who neither participated in the arrest or the investigation.  He is only called to read a report which has

25   been prepared by others.  Such a practice does not allow for the considered judgment of grand jurors.  Thus,

26   the release of transcripts is appropriate.

27   [8]      As is indicated above, a "removal" has the following elements: "(1) that a deportation proceeding
     occurred as to [the] defendant and as a result, [(2)] a warrant of deportation was issued and [(3)] executed

28   by the removal of the defendant from the United States."  See Castillo-Basa, 483 F.3d 890.

**V.**

**<u>MOTION TO SUPPRESS STATEMENTS</u>**

Mr. Perez-Gonzalez moves to suppress his statements on the grounds of a failure to comply with <u>Miranda</u> and voluntariness.

**A.     <u>The Government Must Demonstrate Compliance with *Miranda*.</u>**

In order for any statements made by Mr. Perez-Gonzalez to be admissible against him, the government must demonstrate that they were obtained in compliance with the <u>Miranda</u> decision. The government must establish that Mr. Perez-Gonzalez's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).  When interrogation continues without the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his privilege against self-incrimination.  <u>Miranda</u>, 384 U.S. at 475.  The court must indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government is great.  <u>United States v. Heldt</u>, 745 F. 2d 1275, 1277 (9th Cir. 1984).

In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the circumstances surrounding the case.  <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>United States v. Garibay</u>, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the validity of a <u>Miranda</u> waiver requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and intelligent.  <u>Derrick v. Peterson</u>, 924 F. 2d 813 (9th Cir. 1990).  The second prong requires an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Id.</u> at 820-821 (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987)).  Not only must the waiver be uncoerced, then, it must also involve a "requisite level of comprehension" before a court may conclude that <u>Miranda</u> rights have been legitimately waived.  <u>Id.</u> (quoting <u>Colorado v. Spring,</u> 479 U.S. at 573).  Unless and until <u>Miranda</u> warnings and a knowing and intelligent waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used against the defendant.  <u>Miranda</u>, 384 U.S. at 479.  The government in this case must prove that Mr. Perez-Gonzalez waived his rights intelligently and voluntarily.  Mr. Perez-Gonzalez disputes any allegation any waiver was knowing, intelligent, and voluntarily.

**B.    Mr. Perez-Gonzalez's Statements Must Be Voluntary.**

Even if this Court determines that Mr. Perez-Gonzalez validly waived his <u>Miranda</u> rights, it must still make a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court is required to determine, whether any statements made by Mr. Perez-Gonzalez are voluntary.  In addition, section 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Perez-Gonzalez understood the nature of the charges against him and whether he understood his rights.  Without such evidence, this Court cannot adequately consider these statutorily mandated factors.

Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual determination is required, FED. R. CRIM. P. 12 obligates courts to make factual findings.  <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" <u>id.</u> at 610 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

**C.    <u>This Court Must Conduct An Evidentiary Hearing</u>**

Accordingly, this Court must conduct an evidentiary hearing to determine whether the government can meet this burden and use Mr. Perez-Gonzalez's statements against him.  18 U.S.C. § 3501.  Since "'suppression hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 609-10 (9th Cir. 1990) (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)).  Mr. Perez-Gonzalez's statements were made as a result of the coercive tactics employed by the agents and made without a Miranda waiver.  Unless and until the government demonstrates that these statements were made voluntarily, the statements may <u>not</u> be used <u>for any purpose</u> at trial.

**VI.**

**<u>REQUEST FOR LEAVE TO FILE FURTHER MOTIONS</u>**

Mr. Perez-Gonzalez and defense counsel have not received all the discovery in this case.  As new information comes to light, the defense may find it necessary to file further motions.  Therefore, defense

1  counsel requests the opportunity to file further motions based upon information gained from any further

2  discovery.

3                                          **VII.**

4                                      **CONCLUSION**

5          For the reasons stated above, Mr. Perez-Gonzalez respectfully requests that this Court grant the

6  foregoing motions.

7                                          Respectfully submitted,

8                                          */s/ Robert R. Henssler, Jr.*

9  Dated: May 13, 2008                     **ROBERT R. HENSSLER JR.**
                                           Federal Defenders of San Diego, Inc.
10                                         Attorneys for Mr. Perez-Gonzalez

## CERTIFICATE OF SERVICE

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his information and belief, and that a copy of the foregoing document has been served this day upon:

**Rebecca Kanter**
Rebecca.Kanter@usdoj.gov,efile.dkt.gc1@usdoj.gov,diana.ortiz@usdoj.gov

Dated: May 13, 2008

_____/s/  Robert R. Henssler_____
ROBERT R. HENSSLER, JR.
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467  (tel)
(619) 687-2666  (fax)
e-mail: Robert_Henssler@fd.org

08CR1138